**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CHIEF JUDGE LEWIS T. BABCOCK**

Civil Case No. 05-cv-02185-LTB-MJW

RMES COMMUNICATIONS, INC., a Colorado Corporation,

    Plaintiff,

v.

QWEST BUSINESS GOVERNMENT SERVICES, INC., a Colorado corporation,
PREMISYS SUPPORT GROUP, INC., a Colorado corporation,
OLIVER P. SALAZAR, an individual, in his personal capacity,
PAUL JOHNSON, an individual, in his personal capacity,
SHARON SEVY, an individual, in her personal capacity, and
STEVE KELLER, an individual, in his personal capacity,

    Defendants.

_____

**Order**
_____

Defendants Qwest Business Government Services, Inc., Sharon Sevy and Steve Keller ("the Qwest defendants") move to stay all proceedings and to compel arbitration of all claims by plaintiff RMES Communications, Inc., ("RMES"). RMES asserts that Qwest has waived its right to compel arbitration and is estopped from asserting this right, and requests an evidentiary hearing on the issues of waiver and estoppel. For the reasons stated below, Qwest's motion is GRANTED in part, and DENIED in part.

**I.  BACKGROUND**

This case is a dispute between RMES, a subcontractor at Denver International Airport ("DIA") and Qwest, the prime contractor, and Premisys Support Group, Inc., (PSG) another Qwest subcontractor. Qwest provides telecommunications services to the City and County of Denver ("City") at DIA under a Maintenance and Service Agreement for Premises Wiring and

Communications Systems ("the Master Agreement.") The Master Agreement, originally signed October 27, 2000, had an initial term of 5 years, with options to renew for two additional terms of three years each. RMES and PSG are subcontractors to Qwest under the Master Agreement. Their subcontracts require them, among other things, to provide certain dedicated personnel to fill positions for Qwest. The subcontracts, like the Master Agreement, are for five years with the opportunity for extensions. Qwest's subcontract with RMES contains an arbitration clause that states in part that "any claim controversy or dispute. . . shall be resolved by arbitration."  There is no contract between RMES and PSG.

RMES is a qualified Small Business Enterprise for the purpose of qualifying to do business with the City of Denver. Herman Malone, an African-American, is the sole owner and shareholder of RMES.  According to RMES, the team of Qwest, RMES and PSG worked together to obtain and execute the Master Agreement with the City, in part to meet the City's goal of giving business to ethnically diverse teams of contractors. Sharon Sevy ("Sevy") is Qwest's Regional Sales Director for Government and Business Services. Steve Keller is program manager for Qwest's work at DIA under the Master Agreement. Oliver Salazar is President and CEO of PSG. Paul Johnson is a PSG employee provided by PSG to Qwest who acted as a project manager for Qwest under the Master Agreement. (PSG, Salazar and Johnson are herein referred to as "the PSG defendants.")

RMES brings numerous claims against the PSG and Qwest defendants stemming from the following events.  In July of 2003, Qwest informed RMES that a dedicated technician RMES provided to Qwest under the subcontract, Ronnie Young,  had engaged in unacceptable conduct with a PSG employee, Shelly Phillips. RMES promptly fired Young, and PSG similarly fired

2

Phillips. Malone tried but was not able to obtain additional information from Qwest about this incident. According to RMES, Qwest refused to allow RMES to backfill Young's position, but instead filled the slot with a Qwest employee. Qwest did allow PSG to fill Phillips' position. RMES also alleges that Qwest hired away an RMES employee to work for Qwest directly, doing the same work the employee was doing through RMES for Qwest. RMES alleges that Qwest has not engaged in similar practices with any other subcontractor.

On January 14, 2004 RMES filed a complaint with the Federal Aviation Administration ("FAA") alleging that these actions constituted illegal discrimination by the City and by Qwest. The FAA investigated the actions by the City, and concluded that the City had not engaged in discrimination. At the suggestion of the FAA, the City hired the Mountain States Employers Council ("MSEC") to investigate RMES's charges against Qwest. The record is not clear on the precise relationship between the City, the MSEC and the FAA in these investigations. The record does contain a lengthy letter from Qwest to MSEC dated April 1, 2005 regarding these events, providing both factual and legal responses to the RMES allegations. On May 26, 2005, the FAA notified the City that it concluded that the City had not engaged in illegal discrimination, and that it was satisfied that the MSEC investigation of Qwest had discharged the City's obligations under federal anti-discrimination laws. Neither the MSEC report nor the City's response are in the record, so the scope and conclusions of the MSEC report are not clear. It appears, though, that the MSEC did not find evidence of discrimination by Qwest and the City accepted this report. The FAA states only that the MSEC's report "appears to be impartial and complete" and "meets the Department's obligations under 49 C.F.R. § 21."

RMES alleges also that Qwest and PSG have attempted to systematically exclude RMES

from participating in non-routine work opportunities at DIA, including preventing RMES from having a fair opportunity to bid for the extension of its own subcontract with Qwest. RMES asserts that Qwest began discussions with another African-American owned company to provide the services at DIA that had heretofore been provided by RMES. The City agreed to extend the Master Agreement in April of 2005. Qwest, rather than similarly extend its subcontract with RMES, issued a Request for Proposals (RFP) for the scope of work that RMES had been performing for Qwest under the Master Agreement. The RFP limited the subcontract to one year and imposed what RMES characterizes as "draconian terms." RMES, and other firms not currently subcontractors to Qwest, were free to bid on the RFP. In July of 2005, Malone provided to Qwest written objections to the RFP and to the RFP process and, according to RMES, directed Qwest to consider the letter and the information Qwest already had available as its response to the RFP. In September of 2005, Qwest informed Malone that Qwest had not selected RMES as a subcontractor under the renewed Master Agreement because RMES had decided not to fully participate in the RFP process. The work that RMES had previously performed would, under the renewed Master Agreement, be performed by PSG and a firm called Star Communications (not a party to this suit.) PSG offered positions under its new subcontract to employees of RMES, but did not offer any work to RMES.

   RMES alleges that these purported actions by Qwest are in retaliation for its role in a lawsuit against Qwest alleging race discrimination. The lawsuit was filed in 1996 by the National Black Chamber of Commerce and numerous minority-owned businesses who supplied telecommunications materials to the Qwest parent company. While the other plaintiffs in the lawsuit settled, RMES proceeded to trial and suffered an adverse judgment. The litigation ended

in 2001.

RMES states that it informed Qwest in July of 2005 that unless the parties could resolve these issues, RMES intended to file a lawsuit. According to RMES, the parties agreed to mediation and discussed issues related to their dispute, such as tolling agreements related to the not yet filed litigation. It is not clear if any mediation sessions actually took place.

On October 14, 2005, RMES filed a complaint in Denver District Court making 14 claims for relief, including violations of constitutional rights, federal anti-discrimination laws and contract and tort claims against one or more defendants.  On October 24, 2005 RMES filed a motion for a temporary restraining order ("TRO") to preserve the status quo and to stop Qwest or PSG from contracting out RMES's work at DIA. On October 28, 2005 the Qwest defendants filed a removal action to the United States District Court for the District of Colorado. On October 31, 2005 Judge Nottingham denied RMES's motion for the TRO. On December 30, 2005 the Qwest defendants filed this motion to stay proceedings and compel arbitration. The PSG defendants oppose arbitrating RMES's claims against them, but support staying all proceedings until completion of arbitration between RMES and the Qwest defendants.

## II.  DISCUSSION

The Qwest defendants and RMES agree that RMES's claims are governed by the arbitration clause of the subcontract.  The only issues in this motion are 1) whether Qwest has waived its right, or is estopped from exercising its right, to compulsory arbitration; 2) whether Qwest may require that RMES's claims against Premisys be subject to compulsory arbitration and 3) whether, if not subject to arbitration,  RMES's claims against the Premisys defendants should be stayed pending the outcome of arbitration (if any) between RMES and the Qwest defendants.

A.    Waiver and Estoppel

RMES and the Qwest defendants devote the bulk of their briefs to substantive arguments on the issues of estoppel and waiver. RMES contends, and the Qwest defendants deny, that Qwest's role in the MSEC/City investigation of the RMES complaint and the Qwest defendants' motion to this court for compulsory arbitration constitute waiver of its right to arbitrate.  RMES argues in the alternative that an evidentiary hearing is necessary to develop the facts sufficiently to show that Qwest waived or is estopped from asserting its right to arbitration. The Qwest defendants' argue that under these facts there has been no waiver and no evidentiary hearing is needed.

However, before addressing waiver and estoppel, I first must consider the threshold question of whether this issue should be resolved by a court or by an arbitrator. RMES and the Qwest defendants engage this issue circuitously. RMES, while ostensibly wishing this court to resolve the waiver issue, argues that Tenth Circuit authority establishes that an arbitrator and not a court must determine waiver and estoppel issues stemming from conduct outside of the pending litigation.  RMES makes this argument not in order to have an arbitrator decide this issue, but to support the more byzantine proposition that the Qwest defendants waived their right to seek arbitration by mis-stating in this court the law on who decides waiver. The Qwest defendants, conversely, argue that Tenth Circuit authority supports a district court's resolution of the waiver issue. They make this point not to defend the right of this court to decide the waiver issue, but to deny that they have waived their right to arbitrate.  In spite of the parties' dance of avoidance, I will address this issue directly.

Both parties cite to *Reid Burton Construction, Inc., v. Carpenters Dist. Council of*

*Southern Colorado,* 535 F. 2d 598 (10th Cir. 1976) to support their respective positions. *Reid Burton* held that "enumerated equitable defenses," such as waiver, generally are settled by an arbitrator. *Id.* at 604. However, a judge determines the waiver issue when it arises "solely during the course of the judicial process." *Id. Reid Burton* analyzed a prior Supreme Court decision, *International Union of Operating Engineers, Local 150, AFL-CIO v. Flair Builders, Inc.,* 406 U.S. 487, 491-492 (1972), which held that once a District Court concludes that two parties have agreed to arbitration, whether one party has lost its right to arbitrate under the doctrine of laches is itself an issue for arbitration. *Id. Reid Burton* narrowed somewhat the scope of *Flair Brothers*, limiting it to situations where the conduct giving rise to the equitable defense occurred outside of the judicial process. *Reid Burton,* 535 F.2d at 603-604.

The Qwest defendants, inexplicably, contend that *Reid Burton* held "unequivocally" that the question of whether a party has waived the right to arbitrate is for a judge, not an arbitrator. As discussed above, *Reid Burton* holds no such thing. Qwest also cites the unpublished case of *Dexter v. Prudential Ins. Co. of America,* 215 F.3d 1336 (Table), No. 99-3137, 2000 WL 728821 (June 7, 2000), where the Tenth Circuit upheld a district court's substantive decision on a party's waiver of arbitration. While *Dexter* may implicitly endorse a judge deciding this issue, *Dexter* does not directly address whether equitable defenses to arbitration are arbitrable, and so is of limited usefulness here.

Neither party addresses the highly relevant United States Supreme Court case of *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79 (2002). In *Howsam,* a brokerage firm and its customer disputed whether an arbitration requirement in their contract had expired. *Id.* at 82. The Court considered whether this issue should be decided by a judge or an arbitrator. *Id.* at 83. In

7

general, a court, not an arbitrator, decides "questions of arbitrability."*Id.* However, the *Howsam* court found that this doctrine applies only to disputes over whether particular claims or particular parties are bound by an arbitration clause. *Id.* at 84. This doctrine does not apply to "procedural questions which grow out of the dispute and bear on its final disposition," which are decided by an arbitrator. *Id.* at 84 (internal cites omitted.) These procedural issues include "allegations of waiver, delay or a like defense to arbitrability." *Id., quoting Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25 (1983). Since *Howsam,* the Supreme Court has upheld this basic framework for defining a "gateway" question of arbitrability. *See Green Tree Financial Corp. v. Bazzle,* 539 U.S. 444, 452 (2003) and *Pacificare Health Systems, Inc., v. Book,* 538 U.S. 401, 407 n.2 (2003).

In this case, there is no question that the underlying claims are subject to arbitration, or that the parties are bound by this arbitration clause. This dispute over waiver and estoppel is therefore explicitly in the category of procedural issues that *Howsam* dictates must be addressed by an arbitrator.

The Qwest defendants, while not addressing *Howsam,* cite *Marie v. Allied Home Mortgage Corp.,* 402 F.3d, 1, 14 (1st Cir. 2005) for the proposition that a judge decides issues of waiver where the conduct purportedly constituting waiver occurs in the same litigation. This applies even where the waiver activity is the defendant's participation in an EEOC proceeding. *Id. Marie* explicitly did not address a situation where the conduct constituting waiver occurred in non-litigation related activity. *Id.* at 14, n.9. The Qwest defendants apply this logic here and argue that neither their participation in the FAA/City investigations of RMES's charges nor their activity in this court justify having an arbitrator address waiver issues. Its conduct in this court

should be analyzed by this court, and its role in the administrative investigations are similar to the defendant in *Marie's* role in the EEOC proceedings.

I find the Qwest defendants' argument unpersuasive. Notwithstanding *Marie*, prevailing Supreme Court authority states that a waiver or estoppel challenge to arbitration should be decided by an arbitrator, not a judge. *Howsam* does not distinguish between waiver resulting from the same litigation or waiver resulting from other activity. Even subsequent First Circuit cases that cite approvingly the waiver language from *Howsam* do not mention *Marie's* distinction between litigation and non-litigation related waiver. *See  Kristian v. Comcast Corp.,* ____ F.3d ____ , Nos. 04-2619, 04-2655, 2006 WL 1028758 at 14 (1st Cir. April 20, 2006).  While the Tenth Circuit in *Reid Burton* does make this distinction, this case preceded *Howsam* by more than 30 years, and so may not still be good law.

I would reach this same conclusion even applying the reasoning of *Marie.* The conduct RMES claims to constitute waiver is Qwest's participation in the FAA/City administrative investigation, Qwest's failure to seek arbitration months after Qwest was aware of RMES's claims and RMES's intent to file suit and the Qwest defendants' argument here that this court should decide the question of waiver. Even assuming that the Qwest defendants' argument to this court is litigation-related activity, there remains the other activity alleged by RMES, which occurred prior to the filing of RMES's lawsuit. My conclusion that the issues of waiver and estoppel should be addressed by the arbitrator is reinforced by the "well settled rule that any doubt about the arbitrability of an issue should be resolved in favor of arbitration." *Bowen v. Amoco Pipeline Co.,* 254 F.3d 925, 937 (10th Cir. 2001).

I therefore conclude that an arbitrator and not a judge should address the parties'

9

arguments regarding waiver and estoppel, and I do not address the question of whether Qwest has waived its right to arbitrate. Since RMES's only argument against arbitration is waiver and estoppel, if the arbitrator concludes that Qwest has not waived or is not estopped from asserting its right to arbitrate, the arbitrator should address the substantive issues in this dispute. Also, since the question of waiver is for the arbitrator to decide, I deny RMES's motion for an evidentiary hearing.

B.     Stay of Proceedings for Claims Against Premisys

The Qwest defendants also argue that RMES's claims against the PSG defendants should be subject to arbitration and stayed pending arbitration. The PSG defendants consent to a stay of RMES's claims pending arbitration, but oppose having the claims against them arbitrated. RMES argues that its claims against the PSG defendants should be neither stayed nor arbitrated.

1.     Should RMES's Claims Against the PSG Defendants be Subject to Arbitration?

The Qwest defendants contend that RMES's claims against the PSG defendants must be subject to arbitration even though RMES is not a party to the contract that contains the arbitration clause. Relying on *Roe v Gray,* 165 F. Supp.2d 1164 (D.Colo. 2001), the Qwest defendants argue that PSG is affiliated with Qwest because it has its own subcontract with Qwest through the Master Agreement, and that the issues involved in RMES's claims against the PSG and Qwest defendants are closely intertwined. *Id.* at 1174-1175. Under either or both of these doctrines, the Qwest defendants aver, it is appropriate to require the PSG defendants to be part of the RMES-Qwest arbitration.

I find the Qwest defendants' arguments unpersuasive. *Roe*'s holdings applied to a non-signatory party that is an alter ego for a signatory. *Id.* There is no question here that PSG is not

the alter ego of Qwest. The Qwest defendants' argument that PSG should be compelled to arbitrate because RMES's claims against both parties are intertwined is also unavailing. *Roe* held that in this circumstance the non-signatory could compel arbitration when the claims are intertwined, not that the non-signatory could be compelled to arbitrate when it did not wish to. *Id.* at 1175. All of the authority Qwest cites on this issue similarly holds that when claims are intertwined or stem from the same agreement the non-signatory can compel arbitration, not that the non-signatory can be compelled to arbitrate. *See MS Dealer Serv. Corp. v. Franklin,* 177 F.3d 942, 947 (11th Cir. 1999), *Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 527 (5th Cir. 2000) and *Denney v. BDO Seidman, L.L.P.,* 412 F.3d 58, 70 (2nd Cir. 2005). These cases all rely on the equitable principle of estoppel – that the signatory plaintiff is estopped from denying arbitration with a non-signatory. Qwest has cited no authority, and this Court is not aware of any, that would apply equitable estoppel to enable a signatory defendant to compel another non-signatory defendant to arbitrate against its will.

Qwest's argument flies in the face of the fundamental principle that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Technologies, Inc., v. Communication Workers of Am., et al.,* 475 U.S. 643, 648 (1986). Even despite a strong federal preference for arbitration, arbitration remains "a matter of consent, not coercion." *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 57 (1995). Under these circumstances, I decline to require the PSG defendants to arbitrate.

    2.     Should RMES's Claims Against PSG be Stayed Pending Arbitration?

Both the Qwest and PSG defendants argue that even if PSG cannot be compelled to

11

arbitrate, RMES's claims against the PSG defendants should be stayed pending the outcome of the arbitration between RMES and Qwest. A district court has discretion to stay a proceeding among non-arbitrating parties to a litigation when other parties are arbitrating. *Moses Cohen,* 460 U.S. at 20, n.22.  Exercising such authority is appropriate when the proceedings in arbitration are "based on the same operative facts" and are "inherently inseparable" from the claims in arbitration. *Sam Reisfeld & Son Import Co. v. S.A. Eteco,* 530 F.2d 679, 681 (5th Cir. 1976).  In such a situation, proceeding with the litigation could undermine the arbitration and result in "thwarting the federal policy in favor of arbitration." *Harvey v. Joyce,* 199 F.3d 790, 795 -796 (5th Cir. 2000).

In the present case, RMES's claims against the PSG and Qwest defendants are closely intertwined and derive from the same nucleus of facts. RMES alleges that Qwest and PSG were part of a "continuing scheme" which deprived RMES of certain constitutional rights, which violated RMES's civil rights and which tortiously interfered with RMES's right to contract. The claims are based on the alleged actions of Qwest and PSG to prevent RMES from continuing to work at DIA under the Master Agreement. Under these circumstances, proceeding with the litigation against the PSG defendants would likely undermine or render irrelevant the arbitration between RMES and the Qwest defendants.

RMES contends that staying its claims against PSG would only result in undermining settlement discussions. This argument is unpersuasive, since RMES filed this suit in part presumably because its discussions with defendants were inconclusive, and because it is unclear to what extent these discussions involved PSG at all.

I therefore conclude that RMES's claims against the PSG defendants should be stayed pending the outcome of the arbitration between RMES and the Qwest defendants.

It is ORDERED that Qwest's motion to stay proceedings and to compel arbitration (Docket #21) is GRANTED, in that:

1) RMES and Qwest, Sevy and Keller shall commence arbitration of RMES's claims;

2) The arbitrator shall consider RMES's claims that Qwest has waived or is estopped from asserting its right to arbitrate RMES's claims;

3) PSG, Salazar and Johnson are not parties to this arbitration; and

4) RMES's proceedings against all defendants is stayed pending the outcome of arbitration between RMES and Qwest, Sevy and Keller;

It is further ORDERED that the parties shall file status reports every sixty days from the date of this ORDER.

**DONE,** this ___1st___ day of May, 2006 at Denver, Colorado.

                                          s/Lewis T. Babcock
                                          United States District Chief Judge